Mrs. Maxine M. COMPTON, a widow,
Appellant,

v.

AMERICAN AIRLINES, INC., Appellee.

No. 15848.

Court of Civil Appeals of Texas.

Dallas.

June 23, 1961.

Rehearing Denied July 28, 1961.

Lyne, Blanchette, Smith & Shelton, Erich F. Klein, Jr., and Charles M. Holland, Jr., Dallas, for appellant.

Jackson, Walker, Winstead, Cantwell & Miller, W. B. Patterson, Brundidge, Fountain, Elliott & Bateman, Dallas, for appellee.

YOUNG, Justice.

Appellant, surviving wife of R. Hal Compton, brought this action in Dallas

County against appellee for damages allegedly resulting from the burial of another in place of her deceased husband; such mistaken burial having occurred as a result of alleged negligence of appellees, sued as joint tort-feasors. Each defendant had heretofore filed motions for summary judgment, that of Sparkman-Brand being sustained. The appeal taken therefrom was ruled as premature by this court. See Compton v. Sparkman-Brand, Inc., Tex. Civ.App., 324 S.W.2d 906. Airlines' similar motion was overruled and the parties proceeded to trial against American Airlines, when, after appellant had presented her case, motion of Airlines for instructed verdict was filed and sustained; resulting in a judgment in behalf of both defendants, from which an appeal is now prosecuted. The material facts as hereinafter portrayed, relate to each defendant, though the error complained of in grant of summary judgment in favor of Sparkman-Brand is presented in point 10.

■ In Airlines' motion to remove the case from the jury and render judgment against plaintiff, it asserted as one ground therefor that the negligence of American Airlines had been interrupted by a new and independent cause; that is, the erroneous identification of the Beasley body as that of R. Hal Compton in Dallas by deceased's brother Walter Compton, agent of plaintiff herein. This the trial court referred as a controlling reason for grant of the motion; and such is the burden of appellant's initial point; asserting error in the court's ruling "that there was a new and independent cause which broke the causal connection between appellant's injuries and the appellee's negligence for the reason that such determination by the court is an unlawful invasion of the province of the jury." In this connection, we are mindful of the settled rule that "Where the verdict is instructed in favor of the defendant at the close of the plaintiff's evidence, the court will assume that the facts shown by the plaintiff's evidence are the true facts in the case. A presumption will

not be indulged in favor of the court's action in instructing a verdict where the evidence does not establish the appellee's right to recover with such certainty that reasonable minds could not differ as to the effect thereof." 4 Tex.Jur.2d § 802, pp. 320–321. Consistent with the quoted rule we will follow generally appellant's statement under point 1 for a sufficient resume of the material facts.

R. Hal Compton died in Mexico City on June 21, 1957 and on the same date and in the same city one James Samuel Beasley, Jr., passed away. Both men were United States citizens and both bodies were later shipped back to this country by way of the same American Airlines. On that morning, plaintiff, Mrs. Maxine M. Compton, living in Owensboro, Kentucky, was notified of her husband's death and together with daughter Mrs. Feldhaus secured airline connections and flew to Mexico City, arriving the evening of June 21st. They were there met by Judd Austin, for many years the attorney for Mr. Compton, who conducted them to the Gayosso Funeral Home for a view of deceased; Mr. Austin having made all the arrangements for embalming, etc. Being informed by Judd Austin that American Airlines freight plane was scheduled to leave for Dallas the following night, Mrs. Compton decided to have her husband's body shipped back on that plane. To this end Mr. Compton's body was placed in a dark brown casket and delivered by Gayosso Funeral Home to defendant airline at its freight office, destined to Walter Compton, a consignee and brother, at Dallas, care of Sparkman-Brand Funeral Home. Mr. Austin was present when the body arrived at defendant's freight depot in Mexico City, who personally examined the identifying tag on the crate in which the casket was placed, finding it properly marked and labeled as containing the remains of R. Hal Compton; having no tags or marks on the crate in anyway purporting to identify it as the casket of James Samuel Beasley, Jr. When the two crates containing the bodies (Beas-

ley and Compton) were delivered at defendant's Love Field freight house on early morning of June 23rd, each crate had a white tag attached showing the same name "Richard Hal Compton Wolford", defendant's waybills for both crates having become detached. Airlines' employees then attempted to match waybills with names on crates but to no avail, then weighing both crates, neither of the actual weights corresponding with weights shown on waybills. In the meanwhile, a Mr. Chaffin of Sparkman-Brand, who had already been notified of the arrival of the Compton body, was then informed by Airlines of the mix-

up; calling Mr. & Mrs. Walter Compton, who resided in Dallas, that they must come to Love Field and attempt to identify the R. Hal Compton body. When the Walter Comptons arrived at the freight house at about 5:30 or 6:00 o'clock in the morning, one of the caskets was opened; the other being sealed and could not be opened without use of hack saw or chisel; the Comptons identifying the body in the one open casket as that of R. Hal Compton. Excerpts of the deposition testimony of Mr. & Mrs. Walter Compton is here shown in footnote.[1]

1. Testimony of Walter Compton on identification of body.
(As questioned by attorney for Airlines)
"Q. * * * Just tell me what happened when you got out there? A. Well, we got out of the car, and I walked up ahead of my wife up the ramp, and the Sparkman-Brand representative made some statement as to the resemblance of myself to the man in the casket. We walked in. There were two boxes there. The Sparkman-Brand man said that there were two names on each box, which was the reason for my coming out to identify my brother.
"Q. Let me ask you this: Are you sure about what he said then? Could he have said that the same names were on both boxes? A. It is possible.
"Q. All right, sir, go ahead, * * * A. One box was open about this much (indicating) from just below the shoulders of the body. * * * A. This body was stuffed, it seemed to me, down in a small casket. There was no tint or makeup on the face. He told me that the other casket was sealed, which I assumed that it could not be seen, and my wife and I both walked over and looked at this man, and started out, and then I walked back and looked at him, and I assumed that, I guess, I was in a pretty nervous frame of mind and shock from the death of Hal, and I thought that was Hal's body, and I told the Sparkman-Brand man that I would follow him down to the funeral parlor to pick out a casket, which I did. We picked out one, and my wife and I went home to get ready to go to San Angelo.
"Q. Let me ask you some questions here, now, please sir, trying to get as much details as we can about what happened. Are you familiar with the con-

struction of the Air Cargo Depot from what you saw out there that morning? A. No, sir, that is the only time I have ever been in it.
"Q. Let me ask you this: Were there big doors which opened up from the dock into the air cargo office? A. Yes, I would say that they were eight or ten feet in length or breadth.
"Q. And went clear to the top of the building? A. Correct.
"Q. Were those doors open or closed? A. The door was open.
"Q. And these boxes were sitting inside of one of those doors, is that correct? A. Inside the building.
"Q. All right, now, was it daylight at that time? A. The sun was not up.
"Q. Now, * * * the attorneys for plaintiff have alleged that there was only one small light globe illuminating that area where the bodies were; is that your recollection of it? A. To the best of my knowledge, there was only one light hanging from the ceiling.
"Q. Are you familiar with Fluorescent lighting? A. Yes.
"Q. Like these light we have here in this room? A. Yes.
"Q. Are you familiar with the fact that the entire ceiling of that Cargo Depot is covered with lights of the fluorescent type? A. I didn't notice them.
"Q. Are you telling me it was so dark in there that you couldn't see? A. No, sir.
"Q. Was it light enough for you to see? A. I could see.
"Q. You could see? A. Yes.
"Q. Your wife also thought that was your brother? A. That is right.
"Q. Now, you mentioned that you looked at the body once and then started

This casket was then closed and taken to Sparkman-Brand and from there forward- ed to the Massey Funeral Home at San Angelo, where the funeral was to be held;

out, and then came back and looked at the body? A. That is correct.

"Q. Isn't it a fact that the American Airlines' representative, that you actually remained sort of silent when you first looked at him, and that your wife said that that was Mr. Compton on the first time you inspected him? A. I think you might be right.

"Q. And isn't it a fact that the American Airlines' representative told you that he wanted you to be sure about the thing and would appreciate it if you would take another look? A. I don't remember his asking me that.

"Q. Well, would you say that it did not happen? A. To the best of my knowledge, it did not.

"Q. All right, at any rate, you did come back and look a second time? A. That is correct.

"Q. Now, isn't it a fact that you were told that they had unsealed this particular box that you looked at prior to the time you all got there? A. Well, it was open when we got there.

"Q. All right, and isn't it a fact that the American Airlines' man told you after you had looked the second time that if there was any question in your mind, they would unseal the other box and that you told him that it wouldn't be necessary? A. I don't recall stating that.

"Q. All right, would you say that conversation did not occur? A. To the best of my knowledge, I don't remember it.

"Q. All right, now, did you remain while the box which you had viewed was loaded onto the Sparkman-Brand ambulance? A. No, I don't think we did.

"Q. You went on then to the funeral home? A. That is correct.

"Q. And did you see your brother's body again there at Sparkman-Brand? A. No, sir.

"Q. You simply picked out a casket there? A. That is right.

"Q. Did you give Sparkman-Brand any instructions as to what they were to do with the body when it was transferred to the casket? A. I asked him if he would do what he could to the face to make him look more presentable. (Questions by counsel for Sparkman-Brand):

"Q. And on that second call, were you or your wife informed that it would be necessary to come down and identify the body? A. That is correct.

"Q. And did he explain why that was necessary? A. To my knowledge, he

told my wife that the names of the men were on both boxes. * * *

"Q. Well, at any rate, you got the information that some mixup had occurred, and it was necessary to identify your brother's body? A. That is right.

"Q. Now, either you or some other member of the family had previously made arrangements with Sparkman-Brand, had you not, to take charge of your brother's body at Love Field and make some further preparation of the body for burial? A. Yes.

"Q. Did you make those arrangements, or who did? A. I don't remember whether I made them or not.

"Q. Your son had told you previously on the telephone, had he not, that the body would be consigned to you? A. That is right.

"Q. Here in Dallas. A. Yes.

"Q. And it was so consigned to you, was it not? A. That is right.

"Q. Now, when you or your wife got word at 4:30 or 5:00 o'clock that Sunday morning that it would be necessary for you to come down to Love Field, you understood, of course, that the men or employees of Sparkman-Brand did not know your brother's body, and had no way of telling which body was his, isn't that true? A. That is true.

"Q. And the purpose of you going there was to identify it and to prevent any mixup, isn't that true? A. That is true.

"Q. Now, when you got there, as I understand it, you did have sufficient light to see the face of the body which you did identify as your brother? A. I could see him.

"Q. Was he lying flat on his back, or was he turned to one side? A. He was lying on his back, and it seemed that his chin was stuffed down against his chest.

"Q. You saw both of the boxes there that contained these two bodies, didn't you? A. Well, I didn't see the boxes particularly, except the one that was open. He told me that both boxes were there.

"Q. You don't remember seeing the other box? A. I don't recall even going over and looking at it.

"Q. Do you recall what color the box that you did look at? A. About the color of a brown, a brownish color.

"Q. A brownish color? A. Yes.

"Q. Was there a glass covering over that portion of the casket directly over

the other casket was never opened but forwarded by Airlines to Eufaula, Alabama.

On the morning of June 24, 1957 plaintiff, having flown in to San Angelo from Mexi-

the face of this body you looked at? A. I think it was open.

"Q. No glass? A. I don't recall seeing any glass. The lid comes up, a half lid.

"Q. Could you be mistaken about whether there was a glass over that part of the casket? A. I could be.

"Q. All right, now, did you or your wife first look at the body which you identified as that of your brother? A. I think we looked at it about the same time.

"Q. Both of you and your wife did identify the body as that of your brother, didn't you? A. Yes, sir.

"Q. And you knew at that time, didn't you, Mr. Compton, that both the American Airlines representative and the Sparkman-Brand representative were relying on the identification of yourself and your wife? A. I think so.

"Q. You know, of course, that they had no way of knowing which body was which unless some member of the family identified it, isn't that true? A. That is true.

"Q. You didn't ask for more light? A. No, sir.

"Q. You didn't ask for the casket to be brought outside where there would be better daylight? A. No.

"Q. You didn't ask for a flashlight or for additional ceiling lights to be put on, did you? A. No, sir.

"Q. You didn't feel that you needed that, did you? A. No, sir."

Mrs. Walter Compton (questioned by counsel for Airlines): "A. Well, in that conversation, when he called and said we would have to come out, that they had two bodies shipped in from Mexico City.

"Q. And didn't he tell you that the same name was on the outside of both boxes? A. That is right.

"Q. And that it would be necessary? A. Yes. * * *

"Q. All right, now then, you and your husband both looked at the body? A. Yes.

"Q. Did you make any comment when you looked at the body? A. Well, I don't remember what comment I would have made.

"Q. Well, did you make any identification, did you tell anybody that you thought that was your brother-in-law? A. Yes.

"Q. All right, you told the two men that, the Sparkman-Brand man and the American Airlines man? A. Yes.

"Q. Did your husband make any comment? A. No, I don't remember that he did.

"Q. All right, now then, as I understand it, you started to walk away, you and your husband? A. Yes.

"Q. And then came back and looked the second time? A. That is right.

"Q. Now, wasn't the reason that you did that that the American Airlines man told you that he wanted you all to be absolutely sure about the identification? A. I don't remember his saying that.

"Q. All right, at any rate, you did go back and look the second time. A. We did.

"Q. Did your husband make any comment at that time? A. Not that I remember. I don't remember his making a comment of any kind.

"Q. Weren't you advised there at that time that if you all were not entirely sure, that they would open the other box and let you look at it, and didn't you or your husband one at that time say, 'No, that won't be necessary, this is my brother,' or 'brother?' A. I don't remember it that way. The way I remember it, the Sparkman-Brand man had this one casket open, and he said the other casket was sealed, and I don't remember anything to that effect.

"Q. All right, did you ever request them to open the other box? A. No.

"Q. Were you satisfied in your own mind that that was your brother-in-law? A. Yes.

"Q. Was it light enough for you to see is there? A. Well, it wasn't very light. There was just one light that hung down somewhere over where it was."

(Questioned by counsel for Sparkman-Brand):

"Q. Now, you had no information to the effect that this Sparkman-Brand employee or any Sparkman-Brand employees knew your brother-in-law, Richard Hal Compton, did you? A. No.

"Q. You understood, did you not, that the purpose of his asking you and your husband to come out there that morning was to identify this body? A. That is right.

"Q. And when you got out there, you and your husband knew, of course, that both he and the American Airlines man were relying upon you and your husband's identification of the body; they had nothing else to rely on, did they? A. No, that is true.

co City, went again to view the body of her deceased husband, and after looking at the body in the casket, left the room declaring to all present that it was not that of her husband; pointing to difference in clothing from time she had last seen his body, also hair of head, shape and size of body; the undertaker finally convincing her that the changes were due to embalming methods at the Mexican Funeral home; Sparkman-Brand having dyed hair and changed outer clothing. Plaintiff then requested a closed-coffin ceremony at the San Angelo Funeral parlor and at graveside; a great number of friends from the United States and Mexico attending the funeral.

Immediately after the return of plaintiff and daughter to Owensboro, Kentucky they were notified of the mix-up and that the wrong body had been buried at San Angelo. Mrs. Compton then flew back to San Angelo and after viewing body which had been brought back from Eufaula, Alabama identified it as that of her late husband, remarking that there was little change in present appearance from that as seen on first view in Mexico City. Another similar graveside ceremony was then held.

Generally, we may assume that the inception of this "mix-up" lay in the omission of the Mexico undertaker to properly label both crates; contributed to by Airlines in acceptance of same for shipment thus insufficiently marked. In this connection, the trial court has ruled that such negligence of Airlines was interrupted by a new and independent cause; that is, the erroneous identification of the body of R. Hal Compton by his brother, the consignee and agent for plaintiff.

■ The issue of "new and independent cause" is, necessarily, a component of the ultimate issue of proximate cause. " * * * is not an affirmative defense; it is but an element to be considered by the jury in determining the existence or non-existence of proximate cause." Dallas Railway & Terminal Co. v. Bailey, 151 Tex. 359, 250 S.W.2d 379, 383. On the particular subject, it is stated in 30-B Tex.Jur. p. 230: "To break the continuous sequence of an antecedent cause the intervening, efficient cause must be a new and independent cause. By the term 'new and independent cause', or a phrase of similar import, used in definitions of proximate cause, is meant the act or omission of a separate and independent agency, which destroys the causal connection between the negligent act or omission of the defendant and the injury complained

"Q. You have no interest financially or otherwise in this case, do you. Mrs. Compton? A. I do not, no, sir.

"Q. Looking back over the different events that happened, can you think of anything that either the Sparkman-Brand Company or its employees or the American Airlines ·or its employees, or the Massey Funeral Home or its employees did that they shouldn't have done or failed to do that they should have done; in other words, you have been asked a lot of separate questions, and I am just wondering if you know of any other fact bearing on the case, anything that any of these companies did or their employees did that they shouldn't have done or failed to do that they should have done to prevent what happened? A. Now, are you just asking for my opinion?

"Q. Yes, ma'am, and any facts that you know.

"Mr. Patterson: Before she gives it, let the record show that this opinion ain't going to be binding on American Airlines.

"Mr. Gray: Or Robert F. Massey.

"Q. Go ahead, Mrs. Compton. A. In other words, putting myself in this position, if it were my business, and any kind of business, regardless of what it was, I would have opened, would have insisted on opening both caskets.

"Q. But neither you nor your husband suggested that that be done? A. No.

"Q. In other words, you don't recall, as I believe you testified before, you don't recall whether the American Airlines representative or the Sparkman-Brand man suggested that they would open the other casket if there was any doubt about it in your or your husband's minds? A. No.

"Q. You don't recall that? A. No.

"Q. You wouldn't say that that didn't happen? A. No, I wouldn't say one way or another, because I don't recall it."

of, and thereby becomes, in itself, the immediate cause of such injury."

■ Appellant would point out that when the casket containing the body of R. Hal Compton arrived at Dallas it was properly labeled (both baskets marked with name of Compton) but that it was never opened and inspected; that the mix-up was due entirely to the incorrectly labeled casket of James Samuel Beasley, the one opened and inspected. In our opinion, while the prior negligence of Airlines should not be minimized, it was the erroneous identification of the Beasley body as that of deceased, R. Hal Compton that intervened as an independent agency; and thus becoming a classic example of new and independent cause. The identification by Walter Compton of the body viewed was positive; he knowing at the same time that both Airlines and Sparkman-Brand, for that matter, were relying on him entirely for an identification; having no way of determining which body was which unless and until identified by some member of the family; the facts demonstrating as a matter of law, in our opinion, the exercise by both defendants of that degree of care which an ordinarily prudent person under the same or similar circumstances would have exercised. Appellant seeks to invoke the settled rule that the intervening agency must not be set in motion by the party "who initiated the original act." Airline Motor Coaches, Inc. v. McCormick, Tex.Civ.App., 186 S.W.2d 689, 690; pointing out that Walter Compton was called on to make identification by both defendants and used by them for their own purposes; and that a cause is not a separate and independent agency where it is set in motion by the party contributing to the original negligence. With this argument we disagree. Walter Compton was an independent agency, the consignee on the waybill, being the only person to whom the casket in question could be delivered for transshipment.

■ Moreover, it appears from the record that Walter Compton, consignee of the shipment, was negligent as a matter of law in thus mistakenly identifying the body, which negligence was imputable to appellant, precluding a recovery of damages under the well-established doctrine "that for injuries negligently inflicted on one person by another, there can be no recovery of damages for negligence if the injured person, by his own negligence or by the negligence of another legally imputable to him, proximately contributed to the injury." 30-B Tex.Jur. § 88, p. 299. This specific defense was first alleged in defendant's motion for instructed verdict; but the issues incidental thereto were tried without exception or objection. Rule 67, Texas Rules of Civil Procedure. Appellant's point one must be overruled.

Defendant Airlines also pled in defense in motion for instructed verdict the provisions of the Warsaw Convention and International Air Cargo Rules Tariff, applicable to shipment of cadavers between the United States and the Republic of Mexico, providing among other things that no cause of action should accrue to any person for damages or any other matter or thing save and except the consignee on the airway shipment bill; that appellant was not a party to such contract of carriage; and that the trial court could as well have granted its peremptory instruction on such additional grounds. We will pretermit any discussion of these grounds though they have been fully briefed by the parties, in view of our disposition of appellant's point 1 embodying as it does her principal cause of action. (She asserts under point 7 her reliance for recovery for damages upon a tortious act of Airlines committed, at *Dallas, Texas*; reiterating it to be "uncontroverted that when the body of R. Hal Compton reached Dallas it was properly labeled and enroute upon its designated course to San Angelo. It was at Dallas that the Compton casket became crossed with the Beasley casket and was then sent to Alabama.")

Point 10 with respect to trial court's grant of summary judgment in favor of

Sparkman-Brand, Inc., is also overruled; plaintiff's contention being that genuine and material issues of fact exist concerning appellee's negligence for failure to open both caskets. Whatever may have been the legal duty of Sparkman-Brand to appellant through Walter Compton, consignee, under the instant facts we hold as a matter of law that it likewise discharged that duty by exercising that degree of care which an ordinarily prudent person would have exercised under the same or similar circumstances. This conclusion is well stated in the second counterpoint of Sparkman-Brand that it having been employed by Walter Compton "to receive, handle and ship a dead body; and the evidence being undisputed that appellee did receive, handle and ship the body pointed out to it by Mr. and Mrs. Walter Compton, and to their satisfaction, there was nothing before the court to indicate that appellee owed to appellant a duty to make further investigation or inquiry as to identity of the body."

The judgment in favor of both appellees is accordingly affirmed.

WILLIAMS, J., not sitting.